UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

CASE NO. 12-10062-CV-KING

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for
AmTrust Bank,

    Plaintiff,

v.

STEWART TITLE GUARANTY
COMPANY,

    Defendant.
_____/

## ORDER DENYING SUMMARY JUDGMENT

**THIS CAUSE** comes before the Court upon Defendant Stewart Title Guaranty Company's ("Stewart Title") Motion for Summary Judgment (DE #41, filed February 1, 2013). Therein, Defendant Stewart Title seeks summary judgment on the limited issue of the alleged untimeliness of Plaintiff Federal Deposit Insurance Corporation's ("FDIC") written notice of claim. The Court is fully briefed on the Motion.[1] The Court denies summary judgment on this limited issue, without prejudice to file another motion for summary judgment on the issue of prejudice.

### I. Background

Plaintiff filed its Complaint in this case on July 9, 2012 (DE #1) and Defendant filed its

---

[1] Plaintiff FDIC filed its Response in Opposition on March 4, 2013 (DE #45), and Defendant Stewart Title filed its Reply on March 25, 2013 (DE #47). Defendant filed its Statement of Material Facts (DE #42) on February 1, 2013, and Plaintiff FDIC filed its Response to Stewart Title's Statement of Material Facts and its Additional Facts (DE #46) on March 4, 2013.

Answer on August 6, 2012 (DE #7). At a Rule 16(b) scheduling conference held September 25, 2012, the Court and the parties identified the question of 90 day notice as a dispositive issue in the case (DE #21). In brief, parties contest whether the written notice of claim that Plaintiff FDIC sent to Defendant Stewart Title was timely under the 90 day requirement included in the closing protection letter (CPL) for each of the three subject home loans insured by Defendant Stewart Title. Thereafter, the Court set a schedule for limited discovery on the notice issue to be followed by briefing of summary judgment limited to the question of notice (DE #23, filed September 28, 2012). Due to discovery disputes, the Court extended the briefing schedule in its December 11, 2012 Order (DE #39). As indicated above, parties have since fully briefed the issue, making it ripe for ruling by the Court. The following facts are uncontested, unless otherwise noted by the Court. (*See* Defendant's Statement of Material Facts (DE #42) and Plaintiff's Response to the statement (DE #46)).

This case involves real estate loans made in 2008 by AmTrust Bank to three individuals: Juan Pablo Maya, Ivon Marrero, and Winlo Lanuza. The Court observes that the stories of the three loans follow the same general chronology: AmTrust made a loan indemnified by a CPL from Stewart Trust, the borrower defaulted on the payments, and the property was disposed of at a financial loss to AmTrust. The CPL backing each of the three loans contained the same statutorily mandated language required by Section 69O-186.010 of the Florida Administrative Code. Each CPL in this case included, *inter alia*, the following text:

> [T]he Stewart Title Guaranty Company, subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with such closings when conducted by said Issuing Agent or Approved Attorney when such loss arises out of:
> 1.    Failure of said Issuing Agent or Approved Attorney to comply with your written closing instructions . . .
> 2.    Fraud or dishonesty of said Issuing Agent or Approved Attorney in handling your

2

>          funds or documents in connection with such closing.
>    . . .
>    CONDITIONS AND EXCLUSIONS
>    . . .
>    D.     Claims of loss shall be made promptly to the Stewart Title Guaranty Company at its principal office at P.O. Box 2029, Houston, Texas 77252. When the failure to give prompt notice shall prejudice the Stewart Title Guaranty Company, then liability of the Stewart Title Guaranty Company hereunder shall be reduced to the extent of such prejudice. The Stewart Title Guaranty Company shall not be liable hereunder unless notice of loss in writing is received by the Stewart Title Guaranty Company within ninety (90) days from the date of discovery of such loss.

(DE #1-4, 1-6, and 1-8).

While the Court appreciates the repetitive nature of the following recitation of facts, the Court finds that the dates of events are critical to clarifying and addressing the legal question of timely notice.

The Maya loan, for $1,234,492, closed on June 5, 2008. The related CPL is dated May 21, 2008. Prior to the loan closing, AmTrust had the property appraised. On May 23, 2008, David Ruiz of Genuine Trust Appraisals valued the property at $1,650,000. The loan went into default on January 1, 2009, when Maya failed to make the payment due on that date. On February 11, 2009, AmTrust's review appraiser, Mark MacLaughlin of All Keys Appraisal Co., asserted that the value of the property on May 23, 2008 was actually only $775,000. In an appraisal dated March 9, 2009, MacLaughlin stated that the property's value as of February 17, 2009 had decreased to $485,000. On June 3, 2009, AmTrust sued to foreclose the loan, alleging an outstanding balance of $1,231,242.36. On December 4, 2009, Plaintiff FDIC was appointed Receiver for AmTrust Bank. On September 13, 2011, the property sold at a foreclosure sale for $100. On November 14, 2011, the FDIC issued an administrative subpoena to Wells Fargo Bank, N.A. requesting documentation related to the down payment made by Maya in connection

with the transactions at issue in this case.[2] On December 16, 2011, Wells Fargo produced bank records related to the subpoena, and on January 6, 2012, Wells Fargo produced additional records.[3] On January 10, 2012, the FDIC sent written notice of claim on the Maya loan to Stewart Title (received by Stewart Title on January 12, 2012). The Court notes that the same notice letter included claims on all three loans at issue in this case.[4] The Court further notes that the FDIC's notice letter alleged, *inter alia*, that Stewart Title's closing agent failed to comply with closing instructions and that the agent acted fraudulently and dishonestly.[5]

The Marrero loan, for $1,248,750, closed on October 22, 2008. The CPL is dated September 16, 2008. AmTrust had the property appraised twice: on September 16, 2008, Miguel Febles of Atrium Appraisal Services appraised the property at $1,675,000, and on October 6, 2008, David Ruiz of Genuine Trust Appraisals appraised the property at $1,678,000. The loan went into default on January 1, 2009, when Marrero failed to make the payment due on that date. On February 17, 2009, AmTrust's review appraiser, MacLaughlin of All Keys Appraisal, asserted that the value of the property on September 16, 2008 was actually only $755,000. In an appraisal dated March 6, 2009, MacLaughlin stated that the property's value as of February 17, 2009 had decreased to $520,000. On July 7, 2009, AmTrust sued to foreclose the loan, alleging an outstanding balance of $1,248,240.21. On December 4, 2009, Plaintiff FDIC was appointed Receiver for AmTrust Bank. On October 15, 2010, the FDIC[6] assigned the Marrero mortgage to Residential Credit Solutions, Inc. for the sum of $10. On November 14, 2011, the FDIC issued

---

[2] This is an additional fact asserted by Plaintiff FDIC in connection with its Response to the Motion for Summary Judgment (*see* DE #46). Defendant does not contest this fact in its Reply and the Court finds it to be true.
[3] This is an additional fact asserted by Plaintiff FDIC in connection with its Response to the Motion for Summary Judgment (*see* DE #46). Defendant does not contest this fact in its Reply and the Court finds it to be true.
[4] (*See* DE #42-16).
[5] *Id.*
[6] Although Defendant's Statement of Material Facts states that AmTrust Bank assigned the mortgage (¶ 27 of DE #42), the Court's review of the Mortgage Assignment (DE #42-12 confirms that the FDIC as Receiver for AmTrust, assigned the mortgage.

an administrative subpoena to Wells Fargo requesting documentation related to the down payment made by Marrero in connection with the transactions at issue in this case.[7] On December 19, 2011, Wells Fargo produced bank records related to the subpoena, and on January 9, 2012, Wells Fargo produced additional records.[8] On January 10, 2012, the FDIC sent written notice of claim on the Marrero loan to Stewart Title.

The loan to Lanuza, for $1,256,250, closed on October 22, 2008. On September 17, 2008, David Ruiz of Genuine Trust Appraisals appraised the property at $1,678,000. On June 5, 2009, AmTrust sued to foreclose the loan. The Court notes that AmTrust's verified complaint for foreclosure alleged an outstanding balance of $1,254,523.65.[9] On December 4, 2009, Plaintiff FDIC was appointed Receiver for AmTrust Bank. On January 21, 2010, Lanuza filed a Summary of Schedules in his personal bankruptcy action that listed the value of the property as $615,179[10] and the debt owed as $1,254,523.65. This Summary of Schedules was served on AmTrust as a creditor. The Court notes that the Summary of Schedules indicates that such notice was served via first class mail on March 3, 2010.[11] On November 14, 2011, the FDIC issued an administrative subpoena to Wells Fargo requesting documentation related to the down payment made by Lanuza in connection with the transactions at issue in this case.[12] On December 16, 2011, Wells Fargo produced bank records related to the subpoena, and on January 12, 2012, Wells Fargo produced additional records.[13] On January 10, 2012, the FDIC sent

---

[7] This is an additional fact asserted by Plaintiff FDIC in connection with its Response to the Motion for Summary Judgment (*see* DE #46). Defendant does not contest this fact in its Reply and the Court finds it to be true.
[8] This is an additional fact asserted by Plaintiff FDIC in connection with its Response to the Motion for Summary Judgment (*see* DE #46). Defendant does not contest this fact in its Reply and the Court finds it to be true.
[9] (*See* DE #42-13).
[10] Parties agree that Plaintiff FDIC has not produced any updated appraisals for the property.
[11] (*See* DE #42-15).
[12] This is an additional fact asserted by Plaintiff FDIC in connection with its Response to the Motion for Summary Judgment (*see* DE #46). Defendant does not contest this fact in its Reply and the Court finds it to be true.
[13] This is an additional fact asserted by Plaintiff FDIC in connection with its Response to the Motion for Summary

written notice of claim on the Lanuza loan to Stewart Title.

Although the Court acknowledges that Defendant has not conceded fraud (*see* n. 4, DE #47), and while the Court does not make a finding at this time as to whether the closing agent failed to comply with closing instructions or acted fraudulently and/or dishonestly, the Court finds it credible that Plaintiff first discovered the facts that allegedly support such allegations through the bank records received in December and January of 2011. *See* Plaintiff's Response in Opposition to the Motion for Summary Judgment (DE #45) at 12; *see also* Plaintiff's Amended Response to Interrogatory #6 of Defendant's Second Set of Interrogatories (DE #46-8). Also, while neither party's Statement of Facts references how or when such a denial occurred, the Court infers from the pleadings that between January 12, 2012 (the date on which Defendant received Plaintiff's claim letter) and July 9, 2012 (the date on which the Plaintiff filed the instant lawsuit), Defendant informed Plaintiff that it would not reimburse the three claims.

## II. Legal Standard for Summary Judgment

Summary judgment is appropriate where the pleadings and supporting materials establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex*, 477 U.S. at 323–24.

The moving party bears the burden of pointing to the part of the record that shows the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). One the moving party

---

Judgment (*see* DE #46). Defendant does not contest this fact in its Reply and the Court finds it to be true.

6

establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) (holding that the nonmoving party must "come forward with significant, probative evidence demonstrating the existence of a triable issue of fact.").

"Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts." *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). On a motion for summary judgment, the court must view the evidence and resolve all inferences in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, a mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment. *See id.* at 252. If the evidence offered by the nonmoving party is merely colorable or is not significantly probative, summary judgment is proper. *See id.* at 249–50.

### III. Discussion

"The (insert title insurer) shall not be liable hereunder unless notice of loss in writing is received by the (insert title insurer) within ninety (90) days from the **date of discovery of such loss**." Section 69O-186.010 of the Fla. Admin. Code (emphasis added). In other words, once the insured has "discover[ed] . . . such loss," the insured has ninety days in which to notify the insurer of its claim.

A plain reading of the text might be that the only discovery an insured need make before the 90 day clock starts is that a financial loss occurred. However, such an interpretation would

disregard the need for the knowledge that such loss could potentially be a *covered* loss. It would be absurd, for example, to interpret the CPL to require the insured to send notice of claim every time it lost money on a mortgage transaction. Like any insurance policy, the Florida CPL includes coverage guidelines for what is, and by implication, is not, a covered loss.

There are only two federal district court decisions that directly interpret the 90 day notice requirement in the Florida CPL: *Federal Deposit Insurance Corp., as Receiver for IndyMac Bank, FSB v. Attorneys' Title Insurance Fund, Inc., et al.*, Case No. 10-21197-CIV-Huck/Bandstra (S.D. Fla. May 17, 2011) (slip op.) ("*IndyMac*"), and *U.S. Bank National Ass'n v. First American Title Insurance Co.*, No. 2:10-cv-503, 2012 WL 1080876 (M.D. Fla. 2012) ("*U.S. Bank*"). The courts in *IndyMac* and *U.S. Bank* rely on analogous law in other areas to interpret the Florida CPL: *IndyMac* looks to the law of employee fidelity bonds, and *U.S. Bank* looks to general Florida insurance law[14]. Although unpublished, they provide helpful guidance.

In *IndyMac*, as in the case at bar, the FDIC had taken over a failing bank (IndyMac) as Receiver. The relevant dates in *IndyMac* are as follows: A real estate purchase, funded by two indemnified loans, took place in February of 2007. On September 26, 2007, IndyMac issued a Fraud Recovery and Loss Mitigation Report on the closing of the then-defaulted loans. According to the court, the insured definitely knew of the facts supporting potential coverage by September of 2007. On December 3, 2007, IndyMac charged off one of the loans as a complete loss, a date on which, according to the court, the insured suffered actual loss.[15] In July of 2008, the FDIC took over IndyMac and inherited the loans, and in May of 2009, the FDIC sent a claim

---

[14] The thrust of the *U.S. Bank* opinion focuses on the question of prejudice, for which the court turns to general insurance law to interpret the CPL language. As part of its prejudice analysis, the *U.S. Bank* court had to address the 90 day notice. Therefore, while no specific law is cited for the court's finding regarding the 90 day notice issue, it follows that the court's general reliance on Florida insurance law informed its interpretation of the 90 day notice requirement of the Florida CPL.

[15] The question of whether there was actual loss was another issue in *IndyMac*.

8

letter to the defendant insurer for the losses. On Summary Judgment, the defendant insurer argued that the claim was untimely because actual loss took place more than 90 days before the notice of claim letter. The court agreed.

The *IndyMac* court's analysis analogizes the law of employee fidelity bonds to the Florida CPL. The court began with *Magnolia Management Corp. v. Federal Insurance Co.* (06-0447, 2007 WL 4124496 (W.D. La. Nov. 19, 2007)), which held that the notice period begins with "the discovery of facts giving rise to a potential claim – not the discovery of the extent of loss." *IndyMac* at *10 (quoting *Magnolia Mgmt.* at *6). The *IndyMac* court continued with fifth circuit opinions, such as *FDIC v. Aetna Casualty & Surety Co.*, 426 F.2d 729, 739 (5th Cir. 1970). *IndyMac* quotes *Aetna Casualty*: "The well-established rule is that the Insured under a blanket employee's fidelity bond is not bound to give notice 'until he (has) acquired knowledge of some specific fraudulent or dishonest act which might involve the (Insurer) in liability for the misconduct.' Notice is not required when the obligee merely suspects or has reason to suspect the wrongdoing." *IndyMac* at *11 (quoting *Aetna Casualty*, 426 F.2d at 739, which quotes *Amer. Surety Co. v. Pauly*, 170 U.S. 133, 144 (1898)). As the court wrote in *IndyMac*, "[s]o long as the FDIC or its predecessor IndyMac had knowledge of specific acts that may trigger CPL coverage and had knowledge that the collateral was insufficient to cover the amount of the loans, it 'discovered' an actual loss within the meaning of the CPL." *IndyMac* at *11.

In its Reply to the instant Motion, Defendant encourages this Court to read *IndyMac* as only having decided upon when the actual loss took place, and that the court never addressed the question of whether actual loss, without discovery of the facts giving rise to a potential claim, could start the 90 day clock on notice. (DE #47). Such an interpretation of *IndyMac* ignores the court's laborious discussion of the law of employee fidelity bonds as context for its effort "to

9

give meaning to the term 'discovery of such loss' under the CPL." *IndyMac* at *11. The court in *IndyMac* deliberately defines the phrase "discovery of such loss" as including both discovery of actual loss and discovery of the facts giving rise to potential coverage. *Id.*

In 2012, the Middle District of Florida addressed the question of timeliness under the 90 day notice provision in *U.S. Bank*. The *U.S. Bank* timeline was as follows: the insured knew of the title defect (the facts giving rise to a potential claim under the CPL) by either April 8, 2008 or July 31, 2008. The notice of claim was dated November 19, 2008. The foreclosure sale – actual loss – was December 29, 2008, *after* the claim was made. In its Response (DE #45), Plaintiff argues that the court in *U.S. Bank* found that the claim letter was untimely under the 90 day rule. While *U.S. Bank* does state that the "letter notice was not timely," the decision proceeds further to explain that because actual loss took place after notice was sent, "the policy protection remains in effect but prejudice from lack of an earlier notice than the November 19, 2008 letter . . . must be weighed." *U.S. Bank* at *4 – 6. Therefore, although *U.S. Bank* held that the amount of reimbursement would be affected by prejudice (the amount of time the insured waited to notify the insurer after discovering the facts giving rise to a potential claim), the notice itself was still timely under the 90 day requirement and the claim was still potentially covered. Following this reasoning, if all other facts remained the same but the insured had not notified its insurer until more than 90 days *after* the foreclosure sale, its claim would have been untimely and the insurer could have walked away because of the 90 day notice provision.

Read together, *IndyMac* and *U.S. Bank* require that an insured must have discovered <u>both</u> actual loss and the facts giving rise to a potential claim in order to start the 90 day clock for notifying the insurer of the claim under the CPL. As Defendant correctly points out, these cases involve fact patterns in which the insured discovered the facts giving rise to a potential claim

10

prior to discovering actual loss, the opposite of the case at bar. However, this Court finds that the alternative approach suggested, a plain reading of the 90 day notice language, needlessly disregards the persuasive direction provided by *IndyMac* and *U.S. Bank* on the notice issue.

Therefore, the Court simply needs to determine whether the date at which discovery of both actual loss and the facts giving rise to potential coverage had taken place was within 90 days of the FDIC's January 10, 2012 claim letter. For the Maya loan, there was discovery of the actual loss by September 13, 2011 (the date of foreclosure), if not sooner.[16] The Court finds that discovery of the facts giving rise to potential coverage took place at the earliest on December 16, 2011, the date on which the first Wells Fargo records were produced. December 16, 2011 thus triggered the 90 day period, making notice timely under the 90 day provision of the CPL. For the Marrero loan, actual loss had been discovered by the October 15, 2010 assignment of the mortgage, if not sooner, and the first records were produced on December 19, 2011. Notice was thus timely under the 90 day provision of the CPL for the Marrero loan. Finally, for the Lanuza loan, discovery of actual loss had taken place by March 3, 2010, the date on which the Summary of Schedules from Lanuza's bankruptcy was served on the FDIC, if not sooner. As Wells Fargo produced the first set of records on December 16, 2011, the Lanuza loan was also timely noticed.

The Court must also acknowledge the issue of the prejudice provision of the CPL, which was heartily argued by both parties in regards to its relationship to the 90 day notice provision. Plaintiff FDIC asserted that the clause was intertwined with the 90 day notice clause such that even if the Court were to find that the notice of claim letter was *untimely*, the claims could

---

[16] Under the *IndyMac* and *U.S. Bank* combined rule for determining "discovery of such loss," it is not necessary for the Court to go into an analysis of the exact date when the earlier discovery (in this case, actual loss) took place. Instead, it is enough to find that actual loss was discovered prior to the discovery of the facts giving rise to potential coverage. Accordingly, the Court makes no finding today as to the exact date of discovery of actual loss for the three loans.

11

remain alive because Defendant Stewart Title suffered no prejudice. Defendant responded that prejudice was a separate and unrelated analysis, and thus would not affect the dismissal of the case if the Court were to make a finding of untimeliness. While the prejudice analysis is irrelevant in light of the Court's ruling on the instant Motion, the Court recognizes that prejudice remains a critical issue. The FDIC waited at least fourteen months after discovery of actual loss to issue subpoenas for two loans.[17] Such a passage of time gives rise to an implication of prejudice to Stewart Title.

### IV. Conclusion

Accordingly, after careful consideration and the Court being otherwise fully advised, the following is **ORDERED, ADJUDGED** and **DECREED**:

1. Summary judgment in favor of Mid-Continent Casualty Company be, and the same is hereby, **DENIED without prejudice** to file another motion for summary judgment on the issue of prejudice.
2. The Court will enter a separate scheduling order setting pre-trial and trial and providing for a period of discovery limited to the issue of prejudice.

**DONE** and **ORDERED** in Chambers at the James Lawrence King Federal Justice Building and United States District Courthouse, Miami, Florida this 6th day of May, 2013.

_____
HONORABLE JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

cc: All Counsel of Record

---

[17] The Court acknowledges that the Maya property was sold at a foreclosure sale only three months prior to the issuance of the subpoenas to Wells Fargo.